TINSLEY ET AL. *v.* CARWILE ET AL.

[No. 26,929. Filed October 25, 1937. Rehearing denied November 23, 1937.]

Courtney W. Dice and Ward S. Williams, for appellant.

Robert H. McKinney, for appellees.

TREMAIN, J.—Charles H. Tinsley died a resident of Fountain County, Indiana, on the 17th day of June, 1932. The sole question to be determined in this appeal is whether he died testate or intestate. After his death James G. Tinsley and Estella M. Stout qualified as administrators of his estate and proceeded to administer the estate as that of an intestate. Thereafter, Clara Carwile filed a petition, alleging that the administrators had in their possession a will of said decedent and asked that they be cited to produce it in court. A hearing was had upon which the court made special findings of fact.

The findings disclose that on the 23rd day of June, 1930, the decedent executed his will wherein he gave all of his property to his wife during her natural life. Upon her death it was provided that $2,000 should be paid to decedent's sister, Stella M. Stout, and the remainder to be divided equally among Stella M. Stout, James G. Tinsley, a brother; Clara Carwile, and Obie L. Glover, a brother and sister of the decedent's wife. Decedent's wife died March 21, 1932. The decedent was survived by his brother and sister as his sole and only

heirs at law. He possessed an estate of approximately $10,000.

The court found that the will was duly executed and was kept in the decedent's safety deposit box in a bank; that after his death the box was opened. An envelope was lying on top of the other papers, upon the face of which was written "Will of Chas. H. Tinsley." Across the word "Will" was written the word "Void," and slightly above the first word "Void" was another word "Void." The will was typewritten upon two sheets of paper. Two marks were drawn across the title of the will. Just below the title and diagonally across the first sheet of paper were two lines—one beginning at the upper right-hand corner and the other at the upper left-hand corner of the page and extending to the lower left-hand and lower right-hand corners. The diagonal lines were drawn in such manner as to intersect and cross each sentence contained on that page of the will. On the margin of the first page was the word "Void," beneath which were his initials "C. H. T."

The second page of the will contained the clause appointing his wife as executrix, the date and signature of the testator, the witnessing clauses, and signatures of witnesses. Two lines were drawn diagonally across this page in the same manner as they were drawn across the first page of the will. The lines crossed the decedent's signature and ended at the close of the attesting clause, but did not reach the signatures of the witnesses. They did cross each and every sentence contained on the second page of the will. The court found that the markings above described were made by the decedent with the intention of revoking his will; that no other writings were found among the papers in the nature of a testamentary disposition of his property.

The court further found that none of the lines or writing on said will in any way obscured, obliterated,

or made the typewriting less legible. It was found that a short time before his death, said decedent called at the bank, removed his safety deposit box from the vault, took it to the directors' room alone and after remaining a short time, returned the box to the vault; that it was never opened thereafter until decedent's death. It was further found that an attorney who wrote the will and signed it as one of the witnesses, had a conversation with said decedent a short time after the death of his wife. In that conversation the decedent expressed himself as not being satisfied with his will and stated that the "will wasn't such a will that he wanted to stand," and asked the attorney whether the will would be effective to carry out his desires; that the attorney replied that "it was probably very doubtful whether it would or not."

Finding No. 20 is as follows:

"The Court further finds, that the lines so drawn upon and across each of the provisions of said will and across the names of the testator, 'Chas. H. Tinsley' and the word 'void' across the first page of said will and the initials 'C. H. T.' beneath the said word 'Void' on said first page and the words, 'Void' upon the envelope in which said instrument was found, were each and all drawn, made and written by the said Charles H. Tinsley for the purpose of voiding said will as a testamentary disposition of his property and revoking the same as a testamentary disposition of his property and for no other purpose. But such finding is based upon the testimony of the said Estella M. Stout and Jewell Tinsley that said will and instrument were as shown in Finding No. 10 when said safety deposit box was first opened by them as aforesaid. But by said markings the decedent did not intend to render said will or any part thereof illegible or in any manner destroy the same, or any part thereof, or to remove from said will any essential part thereof; that said markings were intended by him as a revocation without destroying said will or any part thereof, or removing therefrom any essential part thereof, or rendering any part thereof illegible. That he did

not erase or attempt to erase any of the writing or the signature to said will, or any part thereof."

Upon the findings thus made the court concluded that the decedent had failed to *destroy* or *mutilate* his will in such manner as to amount to a revocation thereof, and ordered the will probated.

To constitute a valid revocation of a will the authorities generally agree, under statutes differently worded, that there must be a concurrence of two things: (1) An intention to revoke, and (2) an act manifesting such intention. Therefore, accepting the findings of the court, the first condition, the intention to revoke, has been established. It remains only to determine whether the acts and condition existing constitute an "act manifesting such intention." Is the will of Charles H. Tinsley mutilated by the writing and marks thereon, as the term "mutilate" is recognized by law?

Section 29 of Chapter 30 of the Revised Statutes of Indiana of 1843 provided two methods of revoking a will, one of which was by the execution of another writing duly subscribed and witnessed, and the other was "by burning, tearing, cancelling,. or obliterating the same with the intention of revoking it." That statute remained in force in this state until the present statute was enacted in 1852. The present statute is section 7-301 Burns Ind. St. 1933, section 3354 Baldwin's Ind. St. 1934. It eliminates the words, "burning, tearing, cancelling, or obliterating the same," and instead thereof uses the words "destroy or mutilate the same.". The 1843 statute followed the wording of the English statute, as do most of the statutes of the several states in this country. The older decisions, and decisions following the English rule, strictly adhere to the principle of a total destruction of the instrument or an obliteration to such an extent that the will cannot be read.

No other state seems to have a statute worded exactly as the Indiana statute.

The statute in its present form has been construed by this court in *Woodfill et al.* v. *Patton et al.* (1881), 76 Ind. 575, 40 Am. Rep. 269. That opinion should be decisive of the question here involved. In that case one Daniel Woodfill had executed a will, and after changes had occurred in his family relationship, and in his property rights, he undertook to revoke his will by making certain pencil marks thereon, particularly over his signature, a description of which is stated in the opinion as follows (p. 577):

".... that his signature thereto was much blackened by a considerable number of parallel and circular lines and some cross-marks made by a common lead pencil, and drawn over and about said signature; that some of the smaller letters were wholly blackened thereby, but were yet discernible on a close inspection, and the said signature, as a whole, still remained *quite perceptible and legible* through said pencil marks; ... that said pencil marks were so made by the testator with the intention of revoking said will." (Our italics.)

The lower court found and concluded that the will had not been revoked and ordered it probated. Upon appeal this court, speaking through Elliott, J., reversed the case and said (pp. 579-580):

"There is no question in this case as to the existence of the intention to revoke, for it is expressly found to have existed at the time the act, which it is contended worked the revocation, was done. The question, therefore, is whether the act was such as manifested and effected the intention in a manner authorized by law. There must not only be an act of revocation, but the act must be such as the statute recognizes as a proper manifestation of the intention to revoke. The act will not operate as a revocation, no matter how strongly and unequivocally it may show an intention to revoke, unless it be such an act as the statute prescribes. ... it is generally agreed that the statutes shall receive a strict

construction, and that the case must be brought clearly within their provisions. . . . The specific acts which, under former statutes and at common law, were essential to a valid revocation, as cancellation, burning and the like, are not required to be shown, although they would doubtless be sufficient under the present statute, if of such a character as to show a mutilation or destruction of the instrument."

Judge Elliott then discusses the English statute under which it has been held that there must be a total or a partial destruction of the paper or parchment upon which the will is written or a total obliteration of the words, and then points out that the English statute is not similar to our present statute. That the old statute which provided for revocation "by the burning, tearing, or otherwise destroying the same" was not complied with by drawing a pen across the signature or by erasing part of the instrument, but if the signature or words of the will were discernible, the will was not revoked. Some of the cases held that if the writing could be read by the use of strong glasses, the will was not destroyed and that nothing short of a destruction by burning or tearing would amount to a revocation.

After a review of the holdings along the line just indicated, Judge Elliott said (pp. 581-582) :

'The destruction of a will did not, at common law, imply a ruin of the paper or parchment on which the words were written. It meant taking from the instrument force and effect. The legal force of a will may be as effectually destroyed by erasures as by the destruction of the paper upon which it is written. . . . We think the erasure of the testator's signature, designedly and deliberately made, accompanied, of course, by the intention to revoke, must be deemed a destruction of the will. It is not necessary that there should be destruction, in a literal sense, of the fabric upon which the words of the testator are written. It will be sufficient if the legal force of the instrument is divested or extinguished. It is not important what

the form or character of the specific act is, provided it be such as takes from the will all force and vitality."

Then referring to the present statute the court said (p. 582):

"The language of the present statute is more general and comprehensive than that of the former. Unlike the English statute, it contains no restrictive or particularizing words."

It is then held that the words "destroy" and "mutilate" embrace all the acts amounting to a mutilation or destruction whether they were such as the former statute or common law recognized as effective. That opinion further holds that (p. 583):

"Neither the term 'destroy' nor the term 'mutilate' should be given the narrow and restricted meaning for which appellee contends. 'Mutilate' means something less than total destruction. Mere mutilation of a will would not, of itself, take from a will all legal force. A mutilation, however, which takes from the instrument an element essential to its validity, would have the effect to revoke it. To mutilate, in the sense in which it is generally used by law-writers and by judges, means to render imperfect. . . .

"The manner in which the mutilation or destruction is effected is not of controlling importance."

The Woodfill opinion then concludes and holds that the testator revoked his will although his signature could be read and was plainly legible through the markings thereon.

Comparing the facts in the Woodfill case to the facts in the case at bar, the conclusion is inescapable that Charles H. Tinsley more effectively performed acts effectuating his intention to cancel his will than are shown in the Woodfill case. Charles H. Tinsley's wife had died a short time before he drew the marks upon the face of his will and wrote the word "Void" thereon. He had no children and did not possess a large estate. He

expressed his dissatisfaction of the will to his attorney after his wife's death. When all the facts are considered it must be concluded upon sound reasoning that Charles H. Tinsley mutilated his will, and, since the trial court found that the acts performed by him were done with the intention of revoking the will, the conclusion is inevitable, upon the authority of *Woodfill et al.* v. *Patton et al., supra,* alone, that the will was and is effectively revoked.

The Woodfill case has been cited with approval in other states. Many states with statutes similar to the English statute have liberalized the rule of construction and held that marks upon the face of the will made with the intention to revoke, effect the destruction of it. An examination of the many authorities upon this subject will reveal that the courts are not in harmony, but the trend of the decisions is to uphold acts similar to the acts disclosed in the case at bar as being effective to destroy the will when they were so intended.

Without extending this opinion by citing and quoting many decisions from the courts in this country, it should be sufficient to cite 3 A. L. R. 833; 62 A. L. R. 1367; 79 A. L. R. 1503. Attention is particularly directed to *In re Barnes' Will* (1912), 136 N. Y. S. 940. Under a statute in the old form it was held that the testator had cancelled his will by writing the words "Null and Void," with his name and date across the face of the will. See *In re Parsons' Will* (1922), 195 N. Y. S. 742; *In re Cronin's Estate* (1925), 208 N. Y. S. 680. In the latter case the testator crossed out the signature of himself and witnesses and wrote the words "Void not to be probated" across the will. It was held that the will was revoked although it could be read.

It was held in *In re Kuntz' Will* (1931), 251 N. Y. S. 403, that the will was obliterated by drawing lines across the signatures of the testator and witnesses, and

therefore revoked. *Evans's Appeal* (1868), 58 Pa. 238; *Stuart* v. *McWhorter* (1931), 238 Ky. 82, 36 S. W. (2d) 842; *Noesen* v. *Erkenswick* (1921), 298 Ill. 231, 131 N. E. 622; *Glass* v. *Scott* (1900), 14 Col. App. 377, 383, 60 Pac. 186.

Many authoriites could be added to those already cited, but as indicated above, upon the authority of *Woodfill et al.* v. *Patton, et al., supra,* alone, the decision of the lower court must be reversed.

Judgment reversed with directions to the court to restate its conclusions of law in accordance with this opinion.